Thank you. Good morning, Your Honors. Good morning. Mark Stimlitz, representing Appellants. With me at counsel today was Jeffrey Kuchel, Associate Attorney for Immigrants. In this case, I will immediately report the area that this case is concerned with. It lies just south of Missoula, Montana, on the northern end of the Bitter End, at Bitter End Refuge, in mainly portions of the Lowland National Forest and, of course, the Bitter End National Forest. It is a beautiful country, and it's a historic country. And, in fact, the Forest Service and the partnering agencies will respect this. They were published in the 90s. The 90s does a very good job of describing the historic cultural and environmental attributes of this area. It is not, however, a wilderness area. In fact, as the record shows, and you are probably aware, Forest Service criticisms of the proposal for this area out there don't include what you might normally see out of Montana, Grizzly Bears, bull trout, non-dangerous species, active issues. And so the conclusion by the Forest Service early on, a long time ago, that this was a prime area for a national class ski resort is true and has not changed over the years. The history of this relationship between the McClay family and the Forest Service is long and sometimes contentious. But another aspect of this that has not changed is the Forest Service's Crime Management Directive, the Forest Plan, which was the 1986 Forest Plan. The Forest Plan carried over the earlier research and history and policies regarding the potential for citing a ski area in this area. That's a possibility for the future. And most of the Montana community partners, it's a local non-profit that became very concerned with the treatment by the Forest Service of these proposals because while beautiful and important from an ecological standpoint, this area, the community, is hard to scrap. The economy, like many areas in this country, could use the lift. And given the lack of significant competing attributes between the resort plan that was submitted and the Forest Plan, this seems like a project that should receive serious consideration. From the broadest perspective, our problem with the way this matter was handled is that the Forest Service seemed to be searching for anything it could find to reject this proposal. And although under the applicable regulations, this mission speeding has a fairly limited scope. In fact, the record contains all sorts of information, particularly after we sought judicial review, and it was argued by the government, about all manner of facts that really the Forest Service shouldn't have been considering. And in most, if not all cases, erroneous things. I'm speaking to, for example, the financial wherewithal of the applicants, the history between the Monterey family and the Forest Service. This became very personal for the Forest Service. So when Judge Molloy reviewed this case, and certainly you probably know Judge Molloy has not been known as a major fan of the Forest Service over the years, we expected that, of all things, his decision would be based on a very careful comparison of the project versus the Forest Plan and the various management areas, and especially looking at the Forest Service's decision document. Because the actual decision document is very brief. It's cursory. It doesn't disclose really any basis for evaluation, per se. And yet, in the end, the ruling was that, among other things, the public wasn't as interested in this area anymore. There's questions about financial wherewithal, and just the same litany of what we believe are avoidance mechanisms by the Forest Service. So the hallmark of the Forest Service's decision was, it's been submitting a lot of plans to us over the years. We've rejected them, and this is no different. But the fact is that, as the application cover letter suggested, this was a new plan, and it was created very specifically to avoid problems the Forest Service had identified previously. What the Forest Service ended up doing was, assuming a complete build-out of this project, without any knowledge of really specifically what the details might concern. For example, there's a criticism that this violated the Attribution Management Area 11, which is essentially a roadless area. And so the Forest Service's decision is that timber cutting would occur in this area, and lifts would be installed, and this would be inconsistent with those values. The fact is that there's nothing telling that any lifts would have to be installed or that any timber would have to be cut, and this was just an assumption by the Forest Service. Another good example of that is... ...in this area without a lift. In that particular area, in fact, where people see it now, you can drop people off at the top or have access to a lift in some other area to the top, and they can ski down and go up another way. It's open blade type country. It doesn't need to be cut, and it doesn't have lifts to service that area. On top of that, Your Honor, that, as you can see from the map that's been rendered, was for future possibility, some of that area was. And the importance of the way that the project was structured with phases is that the applicants believe that under the regulation and under the admonishment of the Forest Plan to try to avoid conflicts where possible, that this would be a process. No one granted. There had to have been a lot of process. But this was a new project with a new sponsor, and the belief was if the Forest Service acted in good faith, that questions about some of these inconsistencies could be resolved. Instead, the Forest Service went dark, basically, assumed the worst case scenario and rejected it without further possibility even of appeal with the rationalization that this was not a solicited proposal. So that sort of theme pervades the decision, and it really speaks to an arbitrary process. Steve? Was it a solicited proposal with a Forest Service perspective? We believe it was, Your Honor. The only thing, as we say in our grace, that was missing from this potentially as a Forest Service perspective was that it didn't go out on a Forest Service letterhead. But the Forest Service signed off on it. The Forest Service made sure in the proposal that proposals went to the Forest Service for their review. The Forest Service reserved for itself the right, as it needed to, to accept or reject proposals. There were partners on this, no doubt, the Missoula Economic Development Commission and others. But the idea that the Forest Service didn't participate in these perspectives or didn't have any responsibility or connection with it is really ludicrous. I grant you that we looked and we didn't find much definitive guidance on what a prospectus is, you know, how it's constituted. But I have to say from a practical standpoint that where you have a record like this, a long Forest Service involvement and domination of the discussion through the application of the Forest Plan, when it signs on to a request for proposals, that that's a prospectus. In fact, it is entitled a prospectus. It's just the retrospect. The Forest Service would like to distance itself from that document. I just thought that you, you're the one who instituted this action in the district court to argue that the court didn't have jurisdiction. Why would you bring the case in which the court had no jurisdiction? Well, if I'm misunderstanding your question, Your Honor, we Well, isn't it your case that there's no jurisdiction in district court because there's no exhaustion of the administrative remedy? We did not make that argument. You're making it now? No, what I, the argument we made was that we were entitled to an administrative appeal. Right. Because of the prospectus. We didn't get one, but we were allowed to proceed with it. If the court wanted to have an exhaustive administrative remedy, is that it? If the Forest Service believed that we were entitled to an appeal and we didn't follow it, we didn't pursue it, then, yes, we would have non-exhausted our administrative remedies. But the reverse was the case. There was no administrative appeal. There was nothing for us to do. So we proceeded to judicial appeal. What is your position now? That one, without an administrative remedy from the Forest Service, there's a rejection of your proposal? It is an application for the government. It is, Your Honor. But let me say this. I think that question gets wrapped up pretty quickly in the question of the appropriate remedy here. If the court is implying to feel that the Forest Service didn't act reasonably here, the remedy would be if there was an administrative appeal that we weren't allowed to pursue, I suppose, a remand to allow us to pursue it, or a remand to go to the next level of screening. The problem here is that the Forest Service engaged in so much alleged fact-finding and in reliance on factors that really require more rigorous evaluation than what was disclosed here that the appropriate system process for that is NEPA. And the Forest Service has been real clear, you know, you don't have the money to do this. You know, well, put us into a NEPA process. If we don't have it, that's another story. If we do, then NEPA is the perfect vehicle for evaluating all of this. Because, for example, in the research natural area, which is a big potential. I don't understand your argument. Are you saying that there has to be a NEPA argument before the Forest Service rejected your application? No, Your Honor. What I'm saying is that we need, if relief is going to be afforded here, it needs to be meaningful. And for it to be meaningful, given the Forest Service's history and their willingness to do basically a one-sided NEPA process on their own, let's do one that follows NEPA and follows the public and is transparent and so forth. That's how we need the relief in the year for this. And we're running out of time. Let me ask you this. I may have missed something, but I thought at least part of what the Forest Service would say was that the visual impacts of the project conflicted with specific forest plans for the two forests. And so my question to you is, is there a procedure whereby your client could seek a modification of the forest plans, and what would that procedure be? Essentially, we could ask the Forest Service to pursue an amendment of the Forest Command, but we would not do that, Your Honor, because as the project stands, it is designed not to violate those visual retention values because those are measured from sidelines down in the valley so that people, when they look up, they don't see ski runs and so forth. That's how that works. So that's like the timber sale. You measure those from a fixed point. And so the Forest Service didn't do tarn off, at least not on the record. They didn't do that here. They just declared that they violate visual retention values. So we're comfortable in going forward as is because we are certain that appropriate evaluation would determine that there is no violation of those visual values because that's how the project is designed. Okay, thanks. If it exceeds your time, we'll give you a minute for a follow-up. Yes, Your Honor. May it please the Court, my name is Robert Oakley. I'm here on behalf of the Forest Service. The Court has allowed me to bring a copy of this map, which was also found in hard copies. It's not quite as big, but full-sized, pages 96 of the supplemental insertion record filed by the government. I don't intend to address much or anything to that, but it's just there if the Court has a question about where something is. So I'd like to start with the administrative appeal issue, which I think does present plaintiffs with a conundrum. They're essentially arguing that the Court given a chance to exhaust their administrative remedies, but the District Court got it right here and looked at this first because this is a jurisdictional matter. The regulations that would give someone possibly in the position of a plaintiff a right to administrative appeal applies only when Forest Service issues its own solicitation, referred to as a prospectus, its own solicitation to the public asking for competitive bidding. This solicitation was existed by, I believe it was the Missoula Economic Council, MECD. It no longer exists. It was, that document was issued in 89. It mentions that the Forest Service has block-raised it, and the Forest Service has done that throughout these three of these, with the Central First City Resort, because the Forest Service manages the two forests. It has all kinds of information that's useful to the public, and it's providing it. I also think this entire process raises the issue of fact as to whether or not this was a Forest Service proposal. I don't know. I just met it now. I'm sorry. You know, as far as the record shows, the Forest Service was actively involved with the Missoula Economic Development Committee, whatever it is, right, in this project. They had a, I think, leading voice in what was done. I mean, there were, it's for, you know, like in the legal eye it would be a conspiracy, and the Forest Service would be one of the conspirators. By the way, they were a participant, an active participant in this solicitation. Now, the question is, at what point does that become a Forest Service proposal? Does it have to be on their letterhead? Or is it sufficient as a substance that the proposal reflects the Forest Service's position? Are these questions the fact that it should have been done into a gift report? No, Your Honor. I'm going to start with a slightly different question. Their submission does not say it's in response to the NACD in 1980. When they submitted it in 2013, they didn't say, Hey, we saw this great prospectus, and we're submitting our response to that prospectus. But you know what? It couldn't have gone anywhere. The NACD documented it in 1989. Well, maybe it could have gone anywhere, but the question is, did the forester have the obligation to review it administratively? Well, we did review the proposal. No, no, no. The forester said, oh, you're talking about the resale forest. That's right. Let me just stick on the point, though. They never said they were submitting it under that proposal. And here's another reason to why it's not a Forest Service proposal. NACD and the champion, which at that time, I don't blame them, it would be wrong, reserved the right to screen the proposals. So if they said no, the Forest Service would never see it. The NACD was not in any way created by the federal government. It's sometimes state economic access to it. It's state-created. The state-allowed law allows it to exist. It's trying to stimulate interest in something like receivership. It's an economic development council. That's right. It's an EDC, and there are lots of those in lots of areas around the country. Do we know what that is? Yes, Rhonda, you're correct. But did the council solicit the proposal? Regardless of whether the Forest Service was involved, put that aside, was there a proposal solicited by the council? I don't know. There's nothing on the record that shows they ever got one. I'm sorry. Yes, the document by the council, which is not part of the Forest Service, did ask for proposals from the public at large. But, again, they screened any, and as far as we know, they never got any. And that proposal, or that perspective, came out in 89, when what, 14 years later, no, I'm sorry, much more, 24 years later, we get a proposal that doesn't even, the Forest Service gets one that doesn't exist. That's what I was, my next question was, would it be unusual for that period of time to lapse between the proposal and response from the public? Yes, I mean, had the Forest Service issued this, it would have done so in the public papers, and it would have either wrapped it up, and to some extent the Forest Service did, because it was something the Forest Service did do in response to that perspective. It's in 89 going down. It contacted state and local governments and said, hey, if we get a proposal, we're going to have to evaluate this under deeper. They entered into an MOU with these other government agencies to do so. But, by the early 90s, they're saying, you know, we're never going to do anything. We've never gotten any proposals. And they just said, we're putting our people elsewhere. And it's a dead letter then until, I believe it's 2013, that we get this proposal from the public. So there's just no connection here between 1989 and 2013. Now, there's other reasons that the Forest Service did not, and this is not really a way to benefit. I don't think Mr. McCoy will appreciate this. But if we proceeded to NEPA, for example, he or his companies could be liable for the cost of doing NEPA. So if we say we proceeded with forest submitted plan amendments here, there has to be NEPA for that. Or if we skip through the second step, there's another screening process. There has to be NEPA for that. And he could end up paying for that, and that's very expensive. You have to find someone to help you pay for it. And the business that we rejected it because either we didn't think the resort would work or he was going to pay for it. It's not in the record. The record gives specific reasons. Now, as to a question from the court earlier, is there a way to address this in terms of getting a forest plan amendment? And we addressed this in our briefs. Because one of the things that Mr. Dickens told us, the two forests here are in a revised or sub-forest plan starting this year, they're in the early stages of doing so. If he proposes an amendment to that process as part of the public, like everybody else is entitled to submit comments that say, look, the Forest Service needs to satisfy to provide for world, I'm sorry, a national class ski resort, if the Forest Service proceeds with that, it's on its own dime as far as the business is concerned. And in any event, it would be extremely confusing if the Forest Service started to amend its forest plan in, say, 2015 or 2016, and is going to do a general revision of both forest plans because they're continuous and they have many of the same environmental issues. That was done on an arbitrary basis. But the basic reason why the Forest Service, it was quite specific. It doesn't say anything about misreplaced finances or anything that they don't like him. It says it fails to conform to the forest plan and the guidance issued there under it. And that's one of the factors that the Forest Service is exactly supposed to look at in the screening process where they're able to make decisions quickly and fairly cheaply so that either the Forest Service or the applicant eats up a lot of money and time on something that needs to be done. So how do you respond to your friend's argument that this project could have proceeded without offending the forest police? Well, we cite, you know, for each management area, take management area six, which is where the R&A is located. That R&A is going to be boxed on all sides. Now, to be clear, the proposal said, it didn't say we're going to get directly for the ski run in the R&A, but the Forest Service said in its decision, look, you're going to have a lot of people on these ski slopes and you have not addressed or not explained how they're going to be kept out of the R&A area. Other management areas that are, like, designed for primitive, semi-primitive settings, well, that's the interest of simple things like ski lifts, ski runs, lodges. And as far as backing up things like the visual standards, the Forest Service Administrator, who's a landscape forest architect, looks at the area and writes a memo about the impacts that this nice, nice resort is going to have on the area and going to have in terms of the views of the highways of the slopes. That's something that is written by someone who is uniquely qualified in that opinion. We cannot design a ski resort for the plains. I mean, that is the complaint that, well, we should have told them how to fix it, but I mean, it shows that ski resort, we're talking about a fairly big operation and it's not just, well, let's save, you know, five feet of trees here or there and we're okay. What the Forest Service can tell them is, with the standards that we have in place, we can only go forward with a forest plan amendment. And it just can't fit. And they supported that testimony. Of course, there were more than those conclusions, which I think the documents in the Administrative Record of Studies prepared by people who are qualified to go out in the forest and make those kind of judgments. They don't have any detail to back that up. So the Forest Service made this strictly on the record. The National Class Ski Resort that the plaintiffs would like to build is not something that the Forest Service can revise for them and tell them how to fit it in. And this proposal from 1989 was that if we did it, it would be called a post-hoc rationalization, because it was not mentioned in the submission by the plaintiffs. While we're responding to the 1989 proposal, that's really come up in the solicitation. As far as no more questions, Gabrielle Russ says please. It appears not. Thank you, Counsel. Donald? Your Honors, the question about the age of the MOU and prospectus is answered by the fact that this proposal, there's a continuum of 20 years, 25 years between the Forest Service and submissions by Ms. Lula Clay's family, and then ours, which in the application cover letter states just that. This is a follow-on to previous submissions intended to meet any concerns that were raised in them. The RNA, I'm just going to jump around here in the interest of time. I would refer the Court's attention to ER-334, ER-143, ER-151, ER-106, ER-107, among many areas where the RNA and the ski area can be harmonized through a discussion with the Forest Service and the fact that there are alternatives to the way the RNA is currently set up. The Forest Service is using that RNA to hold that area hostage to its apparent new direction that no ski area can ever be proposed that will ever meet the Forest Service's requirements because that's what the Regional Forest Service said when she rejected our application. Thank you, Your Honors. Any further questions? Thank you, Counsel. Thank you to both Counsel for your argument in this case. This argument is submitted for decision by the Court, Lula-RMJ says, until tomorrow morning.
judges: Tashima, Gould, Rawlinson